Filed 4/11/25  P. v. Haro CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARTIN HARO,<br><br>Defendant and Appellant. | B334187<br><br>(Los Angeles County Super. Ct. No. KA088341) |

APPEAL from an order of the Superior Court of Los Angeles County, H. Clay Jacke II, Judge.  Affirmed.

Dwyer + Kim and John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Theresa A. Patterson, Deputy Attorneys General for Plaintiff and Respondent.

—————————————

Martin Haro appeals the trial court's order denying his petition for vacatur of his conviction and resentencing for the murder of Marquise Le Blanc. The trial court denied Haro's petition following an evidentiary hearing held pursuant to Penal Code[1] section 1172.6, subdivision (d)(3). On appeal, Haro argues that the evidence was insufficient to support his conviction for directly aiding and abetting the murder with implied malice. We affirm the trial court's order.[2]

## FACTS

### A.    *The Murder*

On April 17, 2009, eighteen-year-old Le Blanc went to a large party in Pomona with friends, including Taylor H.[3] The boys were not familiar with Pomona. They learned about another party in Pomona through a text. They were not able to find the party, but as they were driving they saw a bunch of kids walking

---

[1] All further statutory references are to the Penal Code.

[2] Haro also contends that if this court reverses the trial court's order the matter should be transferred to juvenile court for disposition pursuant to Proposition 57. Because we affirm the trial court's order, it is not necessary to address the contention.

[3] The party was attended by teenagers mostly between the ages of 13 and 19 years old, so we refer to the party-goers using terms that describe minors. Haro was 15 years old at the time. No disrespect is intended.

around.  The boys asked if there was a party and were told there was, so they decided to go.

The party was held at Leslie C.'s house.  Leslie C. asked her adult cousin, Deborah M., to help her set up the party.  Leslie C. hired Deborah M.'s boyfriend, Joshua R., as security for the party because she wanted to exclude "anybody that looked like a gangster."  Leslie C. told Joshua R. she did not want Edgar Cisneros[4] or Adam Delgado at the party.  The party took place in Leslie C.'s back yard.  The kids entered through the front gate where security was stationed.  About 100 people attended the party.  The majority of the party-goers were Hispanic.  Cisneros and his girlfriend tried to get into the party but they were refused entrance.  Leslie C. checked to make sure they did not get in through a different entrance, but could not find them.

Deborah M. was at the front gate talking to Joshua R. when Le Blanc arrived.  Le Blanc seemed cheerful and excited to go to the party.  Le Blanc was one of the few Black people there.  Taylor H. and Le Blanc tried to dance with a few girls but the girls turned them down.  At one point, Taylor H. saw Le Blanc talking to a Hispanic male wearing a jacket with "Pomona" written on it.  The Hispanic male pointed to a tattoo on his neck and asked Le Blanc if he saw the tattoo.  Le Blanc responded that he did not want any problems.  Le Blanc also said "I don't care about that."  After that Le Blanc and Taylor H. split up.

About 10 minutes later, Taylor H. heard a commotion and heard that someone had a gun.  Taylor H. heard someone yell "Fuck that [derogatory racial epithet]" and "Get that [derogatory racial epithet]".  Taylor H. looked around for Le Blanc because he

---

[4] Cisnero and Haro were jointly tried for the murder.

knew Le Blanc was one of the only Black people at the party. As he was looking for Le Blanc he heard a gunshot. He went out front and saw people in the street running toward the house. Taylor H. ran in the direction that people were coming from and saw Le Blanc lying still on the ground. There was blood around him. Paramedics arrived soon thereafter.

Vivian P. also attended the party. When she arrived she went over to an area where a dance floor was set up. There were about 50 to 60 people at the party by that time. Most of the people were Hispanic. She saw one Black male. After Vivian P. had been at the party for a while, a commotion started near the D.J. At that point, the crowd in the back yard had increased. The Black male was arguing with a Hispanic male who she did not know. She could not hear what they were arguing about because the music was loud. Someone stepped between them and tried to intervene. The Black male pulled out a gun and waved it at the people around him, including Vivian P. The Black male yelled "Who wants to mess with me now?" He started backing out of the yard, towards the gate, and then began running. Some people ran away from him and tried to climb over a fence to get out of the yard, but about 15 people followed the Black male. Leslie C. testified that Cisneros and Delgado were right behind the Black male as he ran. Vivian P. saw the Hispanic male who had been arguing with the Black male run back into the yard to a wood pile, grab a piece of construction wood, and run back towards the front of the house, yelling "Fuck that [derogatory racial epithet]". Vivian P. stayed in the back yard. She lost sight of the Black male as he ran to the front. After about three to four minutes she heard two gunshots, followed by tires screeching about 10 seconds later.

Deborah M. was inside the house looking out the window when she saw people running and screaming, "He has a gun. Run, run. He has a gun." Le Blanc was waving a gun around at the party-goers. Deborah M. was afraid for her young son who was also inside the house; she ran to the side door to lock it. When Deborah M. got to the door, the gate was closed and Le Blanc was hunched over on the stairs that lead up to the door. "[A] swarm of guys [were] hitting [Le Blanc] really hard. Everybody was just wailing on him." Le Blanc was being attacked by more than 13 Hispanic males. More people were behind them, rushing forward to join the attack. Le Blanc was on his knees with his hands up by his head. Deborah M. could clearly see that his hands were empty. Deborah M. testified that "Everybody was just punching, kicking, but to the point where like you could actually hear him—like when you hear someone getting hit, like you could hear the thud sounds of when they were hitting him." The males were saying " 'Get that [derogatory racial epithet]. Kick his ass. That's what he gets.' " and " 'Let me at him, Let me at him.' Everybody was just trying to hit him."

Deborah M. screamed for the mob to stop, but the beating continued. Le Blanc was not fighting back. Deborah M. had "never seen violence like that. . . . [She had] never seen [any]body get beat up like that in [her] life. . . . It was just relentless. It was non-stop. [She] could just hear the punches and kicks on his body." People in the crowd were throwing bottles, and one hit Deborah M. Leslie C.'s mother came outside and tried to help Deborah M. One of the males swung his fist at Deborah M. She ducked out of the way and the blow hit her aunt's thigh, leaving a big welt. Deborah M. was able to pull Le Blanc up and push the gate open for him to escape. The crowd pushed Deborah M. back.

Le Blanc ran down the street with a group of males chasing after him.  Deborah M. later identified Haro as one of the people who was hitting Le Blanc.  Haro struck Le Blanc with a closed fist.

After Le Blanc fled, someone called Deborah M. a "[derogatory racial epithet] lover" and told Deborah M. that she was "lucky that [she] didn't end up like him and that [she] should have got [her] ass beat just like he did."  Deborah M. walked over to pick up a fallen chair and tripped over a "fake" gun.  Joshua R. picked up the gun and took it away.  Deborah M. saw a male running back from the direction the mob had gone.  He retrieved what looked like a gun from a car parked across the street and ran back toward the mob.  Deborah M. could not see Le Blanc down the street, but she heard a gunshot.  She also heard someone yell, "Pomona, Pomona."  The crowd ran back toward Leslie C.'s house.  She saw the person who had retrieved something from the car get into the vehicle and drive away.

Sandra A. and her husband, Pablo A., lived down the street from Leslie C.  She was inside when she heard a commotion and looked out the window to see what was happening.  Sandra A. saw a group of 25 to 30 kids running in the street toward her house.  They gathered in one area and a fight broke out.  Everyone in the group was kicking and hitting a boy.  Pablo A. estimated that there was a group of 20 to 25 people in the street.  The boy was on the ground.  It looked like all the people had been surrounding the boy and were dispersing.  After the beating stopped and people were walking away, one person pulled out a gun and shot the boy.  The person got into an SUV and drove away.

City of Pomona Officer Melvon Bird was on patrol that night and received a call that there was a man in his twenties

with a gun.  On the way en route dispatch advised that someone had been shot.  When he arrived at the scene, Officer Bird saw 30 to 40 kids running away.  Le Blanc was lying on the ground. Le Blanc did not appear to be breathing and did not respond to the officer.  Officer Bird felt for a pulse and found none.  He saw that there was blood in Le Blanc's ears and a puddle of blood under his head.  There was a bullet casing near Le Blanc's head. The officer called for paramedics.

## B.     *Cause of Death and Injuries*

Deputy Medical Examiner Dr. Lisa Scheinin of the Los Angeles County Coroner's Office determined that the cause of Le Blanc's death was a combination of stabbing and gunshot wounds.  He was stabbed three times, including a stab to the heart.  After the stabbing, Le Blanc was shot once through the back of the head.  In addition to the stabbing and gunshot wounds, Le Blanc suffered multiple head injuries, including abrasions, contusions, and shallow lacerations.  His nasal bridge and ear cartilage were fractured.  Dr. Scheinin opined that Le Blanc likely suffered the injuries as a result of being kicked in the head and stomped on the face.  The abrasions were consistent with tread marks and "pushing the left side of the head into the ground and . . . grinding it into the ground."  Dr. Scheinin did not observe any offensive wounds that would indicate Le Blanc had been fighting back.

7

## C. *Gang Evidence*

City of Pomona Officer Greg Freeman testified that the 12th Street gang (12th Street) is the largest Hispanic gang in Pomona. The area where Leslie C.'s house is located is claimed by 12th Street. 12th Street is notorious for its hatred of Black people. The officer explained that members of a gang are people who live for the gang. They have no other job and are focused on bettering the gang at all times. Associates are people who have a life outside the gang that may include a job or school but "will drop what they got and go assist the gang at a moment's notice." Tagging crews are bonded groups of younger people who operate within a gang's territory and are a source of future recruits for the gang. Tagging crews commit crimes that benefit the gang. The Tinto Killers or TK is a tagging crew that operates within 12th Street's territory. "Tinto Killers" means Black Killers. The Tinto Killers are primarily Hispanic. 12th Street engages in a wide variety of criminal offenses; one of their major activities is murder. 12th Street is also known as "The Pomona 12th Street Gang" and "The Shark Gang." Their symbols include sharks, the letter "P", and the number "12."

Given hypothetical facts that mirror this case Officer Freeman opined that the crime would have been committed for the benefit of a criminal street gang. The murder would benefit the gang because it would demonstrate to rival gangs that there are serious consequences of coming into the gang's territory and disrespecting it. The crime would be more violent because the victim was Black. Numerous people at the party on the night of the killing were members of 12th Street, including Cisneros, Adrian Zuniga, Victor Guillen, and Francisco Martinez. Delgado

was a member of the Most Budded Kings, another tagging crew that operates under 12th Street. At the time of trial, Delgado belonged to 12th Street. Ralph Alfaro and Richard Vasquez were at least associates of 12th Street.

There was no evidence presented at trial that Haro was affiliated with 12th Street or either of the tagging crews. However, at Haro's parole suitability hearing on February 10, 2021, Haro admitted, "Before I came to prison, I was a criminal in every sense of the word. I was a gang member. I was a racist."

## D. *Haro's Text Messages to Friends*

The day after the murder, Haro texted Jessica V., one of the hosts of the party, regarding the incident. Jessica V. was in the back yard when Le Blanc pulled out a gun. Someone told her to get down because there was a guy with a gun. She remained in the garage until the police arrived. Jessica V.'s text conversation with Haro was as follows:

[Haro]: "Did the [derogatory racial epithet] that we fucked up die?"

[Jessica V.]: "O.M.G. W.T.F."

[Haro]: "A lot of people text me telling me that he died."

[Jessica V.]: "What did you guys do?"

[Haro]: "Well, we stomped the shit out of his face."

[Jessica V.]: "You know what, I really don't find that funny, but yes he died and someone shot him. What the fuck were you guys thinking[?]"

[Haro]: "Nah we didn't shoot him and I didn't find that shit funny either. I just wasn't sure what happened."

Jessica C. was also at the party. There was a disturbance and she saw a tall Black male waving a gun. Afterwards, Jessica C. thought that the Black male had been killed by the police officers. Jessica C. had known Haro since elementary school and had dated him in the past. The day after the party, Jessica C. and Victor F. texted with Haro on Victor F.'s phone.

[Jessica C.]: "Hey so are you okay. It's me Shorti.[5]"

[Haro]: "Yeah I'm koo. We killed them though."

[Jessica C.]: "What the fuck. I thought the cops did it."

[Haro]: "Nah they told me he was already dead."

[Jessica C.]: "W.T.F.F[?]. I know I seen him on the ground dead. I couldn't sleep I was so scared."

[Haro]: "I know. Imagine how I feel right now. Me and [Alfaro] were the first ones to fuck him up."

[Jessica C.]: "By the way, how did you guys fuck him up. He had a gun."

[Haro]: "I know but when he was running down the street, we ran behind him. Then [Alfaro] and me starting socking him til he fell. Then I started kicking his face. And then I noticed he was unconscious. That's when more and more people came. And at the end I starting yelling to everyone to leave and I looked at him and he wasn't moving."

[Jessica C.]: "What, then you know who killed him huh?"

[Haro]: "And that's when I knew he was dead already."

[Jessica C.]: "Oh, shit, it wasn't your fault though huh because he was probably on drugs and you guys knocked him out huh."

[Haro]: "Yeah, I hope so, but I can't stop thinking about it."

---

[5] Jessica C.'s nickname was "Shorti."

[Jessica C.]: "Don't trip sweetie. I know it wasn't your fault."

[Haro]: "Yeah, I guess."

[Jessica C.]: "Are you okay babe?"

[Haro]: "Yeah, I'm cool. He fuckin' looked for it so he can rest in fuckin piss now."

[Jessica C.]: "Laughing my ass off. It's peace."

[Haro]: "I meant to write piss stupid."

[Jessica C.]: "You liar. For real?"

[Haro]: "Yeah, laugh out loud."

[Jessica C.]: "So you're livin' to the fullest or what."

[Haro]: "Nah, I living to the money G."

Haro also exchanged text messages with an unidentified person the day after the murder:

[Unknown]: "So what did you do yesterday?"

[Haro]: "I went to a party. And you?"

[Unknown]: "Oh. Cool. How was it? I did nothin'."

[Haro]: "Me and the homies nearly killed a [derogatory racial epithet]." [followed by frowny face emoji].

[Unknown]: "O.M.G. Was this on Virginia Street?"

[Haro]: "Yeah."

[Unknown]: "O.M.G. O.M.G. O.M.G. What happened?"

[Haro]: "Why you asking like that?"

[Unknown]: "Like what? Tell me what happened. So what happened?"

[Haro]: "We beat his ass."

[Unknown]: "Why?"

[Haro]: "Because he pulled a strap out on the homies."

11

[Unknown]: "Oh, damn, that sucks." "Oh, damn, how scary."

[Haro]: "I know, but now I'm a little scared because people say he died."

[Unknown]: "Well, Yesenia's brother was there and he said he got shot."

[Haro]: "Who got shot?"

[Unknown]: "A Black guy. . . ."

Later that day, Haro and the unidentified person had a second exchange of texts:

[Haro]: "Oh, babe I need to tell you something."

[Unknown]: "What?"

[Haro]: "That [derogatory racial epithet] we fucked up died."

[Unknown]: "Fuck babe that fuckin sucks and scary."

[Haro]: "I know."

[Unknown]: "You think it was your guys fault?"

[Haro]: "Yeah."

[Unknown]: "Oh, damn."

[Haro]: "Yeah, I know."

[Unknown]: "I don't think it was you guys."

[Haro]: "I hope not."

## PROCEDURAL HISTORY

The People tried Haro for murder on two theories—(1) direct aiding and abetting and (2) aiding and abetting under the natural and probable consequences doctrine. The People did not allege that Haro stabbed or shot Le Blanc. He was prosecuted based on his role in the mass beating.

The jury found Haro guilty of second degree murder. The jury further found that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), and that a principal personally and intentionally discharged a firearm proximately causing the victim's death (§ 12022.53, subds. (d), (e)(1)). After the jury returned its verdict, the People moved to dismiss the gang and firearm allegations in exchange for Haro's agreement to withdraw his motion for new trial and to waive his right to appeal. The trial court sentenced Haro to 15 years to life in state prison.

In 2019, Haro petitioned to be resentenced under former section 1170.95, now section 1172.6. The trial court summarily denied Haro's petition without appointing counsel because the court concluded that (1) section 1170.95 was unconstitutional, and (2) even if the statute was constitutional, Haro aided and abetted the murder with intent to kill Le Blanc.

On appeal, this court concluded that section 1170.95 was not unconstitutional, and that the trial court had improperly decided the petition without appointing counsel. We reversed the trial court's order and remanded the matter for further proceedings.

On remand, the trial court appointed counsel, and the parties briefed the matter. The trial court issued an order to show cause and held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3).

At the hearing, the court considered the transcripts of trial, the transcripts of Haro's February 10, 2021 parole board hearing, and the testimony of Dr. Katy Dorit Gaines regarding Haro's youth at the time of the crimes and its negative impact on his ability to make decisions and to appreciate the consequences of

13

his actions.  Following the hearing, the trial court again denied Haro's petition.  The court found that the People had met their burden of proving beyond a reasonable doubt that Haro was guilty of directly aiding and abetting implied malice murder.

Haro timely appealed.

## DISCUSSION

### A.   *Legal Principles*

#### 1.   Section 1172.6

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  (Stats. 2018, ch. 1015, § 1, subd. (f).)"  *People v. Lewis* (2021) 11 Cal.5th 952, 959.)  As relevant here, the bill eliminated second degree murder liability predicated on the natural and probable consequences doctrine. (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2; *People v. Strong* (2022) 13 Cal.5th 698, 707, fn. 1.)

" '[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.'  [Citation.]"

14

(*People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*).) "[A] defendant may directly aid and abet an implied malice murder. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 588–591; *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499; *People v. Powell* (2021) 63 Cal.App.5th 689, 710–714, (*Powell*); see also *People v. Langi* (2022) 73 Cal.App.5th 972, 979–983.)" (*Ibid.*)

Senate Bill No. 1437 also added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of murder to seek resentencing. (§ 1172.6, subds. (a)–(c).) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).) At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [of murder under a still-valid theory] beyond a reasonable doubt.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We

must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

### 2. <u>Implied Malice Murder</u>

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).) " (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "[T]he defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' (*Knoller*, *supra*, 41 Cal.4th at p. 152; see *ibid.* [under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death" ']; *People v. Cravens* (2012) 53 Cal.4th 500, 513 (conc. opn. of Liu, J.) ['Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible[]'].)" (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

### 3. Direct Aiding and Abetting Implied Malice Murder

" '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. ([*People v. McCoy* (2001) 25 Cal.4th 1111, 1122.]) In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' [Citations.]" (*Reyes, supra*, 14 Cal.5th at pp. 990–991.)

In contrast, " 'the natural and probable consequences doctrine did not require that the aider and abettor intend to aid the perpetrator in committing a life-endangering act . . . . What was natural and probable was judged by an objective standard and it was enough that murder was a reasonably foreseeable consequence of the crime aided and abetted.' (*Powell, supra*, 63 Cal.App.5th at p. 711, fn. 26.)" (*Reyes, supra*, 14 Cal.5th at p. 991.)

17

**B.**  *Analysis*

Haro argues that the evidence is not sufficient to support the additional elements required to convict him of directly aiding and abetting implied malice murder.  He asserts there is not substantial evidence that (1) he knew that the perpetrators would stab and shoot Le Blanc; (2) he intended to aid and abet the shooting and the stabbing; or that (3) in light of his youth, he understood that his assaultive conduct could enable greater acts of violence.

We reject Haro's third argument at the outset.  Haro does not assert that the trial court failed to consider his youth at the time of the murder, nor could he, as Dr. Gaines testified extensively regarding the impact of Haro's youth at the evidentiary hearing.  Haro's argument goes to the weight that should be afforded to this type of evidence.  On appeal, we do not consider whether there is *some* evidence that could cause the trier of fact to reach a different conclusion, and we do not re-weigh the evidence.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Haro's remaining arguments assume that the life-threatening acts in this case were the fatal stabbing and the shooting, and not the mass beating.  Implied malice murder, as our Supreme Court explained in *Reyes*, *supra*, 14 Cal.5th at pages 988 through 989, is not so limited.  " '[A]n act that will certainly lead to death is not required[.]' " (*Id.* at p. 989.)  Rather, the act " ' "must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' [Citation.]" (*Id.* at p. 988.)  The question is not whether Le Blanc would have survived the attack if not for the stabbing and shooting—rather, we ask whether there was a high probability that the mass

18

beating would lead to Le Blanc's death, and whether it did in fact contribute substantially to his death. We answer both those questions in the affirmative.

This case bears striking similarities to *People v. Schell* (2022) 84 Cal.App.5th 437 (*Schell*). There, the defendant appealed following the trial court's denial of his section 1172.6 petition. (*Id.* at p. 440.) After an evidentiary hearing, the trial court found beyond a reasonable doubt that the defendant aided and abetted implied malice murder. (*Ibid.*) The defendant was one of at least eight attackers who participated in a mass beating of a lone victim. (*Ibid.*) While some of the other attackers used a bat and a shovel to strike the victim, the defendant did not supply or wield a weapon, but used his hands and feet in the "vicious assault."[6] (*Id.* at pp. 440, 443.) The killing was committed in retaliation for perceived "disrespect" of the attackers, who were gang members. (*Id.* at p. 440.) The appellate court concluded that the defendant's presence at the scene, his companionship with the other attackers, his participation, his motivation, and his conduct before and after the fatal attack constituted substantial evidence to support the conclusion that the defendant aided and abetted an implied malice murder. (*Id.* at p. 443.) In reaching this conclusion, the appellate court stated: "The trial court could reasonably infer that appellant knew [the victim] was repeatedly being hit in the head with a shovel and bat and that he intended to aid those acts by participating in the assault. The blows to [the victim's] head were loud enough to be heard by several neighbors, some of

_____

[6] Evidence was presented that the victim was stabbed, but the trial court expressly stated that its ruling " '[did] not depend on the knife.' " (*Schell, supra,* 84 Cal.App.5th at p. 441.)

whom heard someone yell, 'Stop it' and '[y]ou're killing him.' " (*Ibid*.)

Here, evidence was presented that the attackers were predominantly gang members who despised Black people. The mob that attacked Le Blanc was filled with people who belonged to 12th Street—a gang that was notorious for its hatred of Black people—and the tagging crews that operated under it. One of the tagging crew's names translated to Black Killers. One of 12th Street's primary activities was murder. The males chasing Le Blanc to the gate were saying " 'Get that [derogatory racial epithet]. Kick his ass. That's what he gets.' " " 'Let me at him, Let me at him.' " At his parole board hearing, Haro admitted he was a gang member and a racist at the time of the murder. In his text to Jessica C., Haro admitted he was with Alfaro, who was a 12th Street member, and that the two of them "were the first ones to fuck [Le Blanc] up."

Like the defendant in *Schell*, Haro attacked Le Blanc as one of a very large number of gang members and taggers working together. Le Blanc was even more severely outnumbered than the victim in *Schell*—Le Blanc was attacked by more than 13 Hispanic males who were hitting him very hard, just "wailing on him." Deborah M. identified Haro as one of the attackers at the front gate. She saw him hit Le Blanc with a closed fist. More people were behind them, rushing forward to join the attack. Le Blanc was on his knees with his hands up by his head and was not fighting back. Deborah M. could clearly see that Le Blanc's hands were empty. Deborah M. had "never seen violence like that. . . . [She had] never seen [any]body get beat up like that in [her] life. . . . It was just relentless. It was non-stop. [She] could hear the punches and kicks on his body." As in *Schell*, the

beating was so violent that "you could actually hear him—like when you hear someone getting hit, like you could hear the thud sounds of when they were hitting him."

If Deborah M. had not managed to open the gate, there is a high probability that Le Blanc would have been beaten to death in the back yard. There was no indication that the mob intended to cease beating Le Blanc, who was visibly unarmed by the time he reached the stairs. Like the people in *Schell* who witnessed the beating, Deborah M. yelled for the mob to stop, but they persisted. They physically attacked Deborah M. They also injured Deborah M.'s aunt, whose only involvement was attempting to facilitate Le Blanc's escape. There was no pause in the mob's pursuit of Le Blanc. Numerous members of the crowd immediately chased Le Blanc through the gate. By his own admission, Haro led that group. He and Alfaro knocked Le Blanc to the ground and resumed beating him relentlessly until Haro first believed Le Blanc to be unconscious, and then thought he was "dead already."

Although the beating may not have been the cause of death, it was unquestionably a life-threatening act. Absent intervention, there was a very high probability that the beating would lead to Le Blanc's death, in one manner or another— something that Haro well understood. In a text to Jessica C., Haro stated that he believed Le Blanc was dead. When he made the statement, Haro was not aware that Le Blanc was later stabbed and shot. The evidence demonstrates that the attack was vicious and unrelenting from inception. The goal, as several of the participants loudly proclaimed, was to kill Le Blanc.

Once the mass beating is properly identified as a life-endangering act, Haro's other arguments fall to the wayside. He

cannot and does not contend that his actions did not contribute to the mass beating, that he did not know the perpetrators intended to beat Le Blanc so severely that his life would be endangered; or that he did not intend to aid and abet the mass beating. Even after he knew that Le Blanc had died, he made callous jokes about the killing in texts with his friends and said that Le Blanc deserved it. There is substantial evidence that Haro aided and abetted the murder with implied malice.

## DISPOSITION

We affirm the trial court's order denying Haro's petition for resentencing pursuant to section 1172.6.

NOT TO BE PUBLISHED.


                                        MOOR, J.

WE CONCUR:


        BAKER, Acting, P. J.


        KIM (D.), J.